UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



-----------------------------------X

STEVE LAU,

                              Plaintiff,          **COMPLAINT**

       - against -

LEONARD MEZEI, HAROLD ZOREF, NORTHERN          <u>JURY TRIAL DEMANDED</u>
FUNDING, LLC, and NORTHERN HEALTHCARE
FUNDING, L.L.C.,

                              Defendants.

-----------------------------------X

Plaintiff Steve Lau, through his undersigned counsel, Hoguet Newman

Regal & Kenney, LLP, alleges as follows:

## <u>NATURE OF THE CLAIM</u>

1.      Mr. Lau brings this action for violation of the federal securities laws,

fraud, fraudulent inducement, negligent misrepresentation, conversion, and

breach of contract against Leonard Mezei, his companies, and long-time friend

and business associate Harold Zoref, who engineered a scheme under which

they defrauded Mr. Lau of his retirement funds.  Mr. Zoref has been Mr. Lau's

accountant and investment advisor since 2006.  Mr. Lau seeks to recover over

$486,000.00 entrusted to Mr. Mezei, plus contractual interest, statutory interest,

consequential damages, attorney's fees and costs, and $10,000,000.00 in

punitive damages.

## JURISDICTION AND VENUE

1.      This court has diversity jurisdiction pursuant to 28 U.S.C. §§1331 and 1332(a).  The amount in controversy exceeds $75,000.00.

2.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§1391(a) and (b), because all defendants reside here and a substantial part of the events and/or omissions on which the claims are based occurred here.

## PARTIES

3.      Plaintiff Steve Lau ("Mr. Lau" or "Plaintiff") is an individual residing at 2027-21st Avenue, San Francisco, California 94116.

4.      Upon information and belief, Defendant Leonard Mezei ("Mr Mezei") is an individual residing at 4666 Grosvenor Avenue, Bronx, New York 10471, whose principal place of business is at 333 Seventh Avenue, Third Floor, New York, New York 10001.

5.      Upon information and belief, Defendant Harold Zoref ("Mr. Zoref"), an individual, is Mr. Mezei's long-time friend of 30 years, business associate and agent who resides in the State of New York and whose principal place of business is at 733 Third Avenue, 21st Floor, New York, New York 10017.

6.      Mr. Zoref has been Mr. Lau's accountant and investment advisor since 2006, thus gaining Mr. Lau's trust and confidence.

7.      Upon information and belief, defendant Northern Funding LLC ("NF") is a New York limited liability corporation with its principal place of business at 132 West 31st Street, 14th Floor, New York, New York 10001.

8.     Upon information and belief, NF is a money lender specializing in short-term mortgages and bridge loans to other entities to acquire real estate investment property.

9.     Upon information and belief, defendant Northern Healthcare Funding, L.C.C. ("NHF") is a New York limited liability corporation with its principal place of business at 333 Seventh Avenue, Third Floor, New York, New York 10001, which is also the principal place of business of Defendant Mr. Mezei.

10.     Upon information and belief, NHF is a money lender specializing in providing financing to medical facilities, including short term bridge loans, and also purchases account receivables of medical facilities.

11.     Upon information and belief, Mr. Mezei owns or controls NF and NHF.

### BACKGROUND

**Mr. Mezei's and Mr. Zoref's Fraudulent Misrepresentations**

12.     In or about January 2008, Mr. Mezei sought investment capital to fund NF and NHF.

13.     Mr. Zoref, as Mr. Mezei's long-time friend, business associate and agent, solicited persons, including his clients, to provide financing to Mr. Mezei in the form of money loans, which Mr. Mezei would then use to fund his various companies including NF and NHF.

14.     Between January and April 7, 2008, Mr. Zoref solicited Mr. Lau to invest with Mr. Mezei, by representing the investment as a low-risk opportunity to earn a high interest rate of return.

15.     Mr. Zoref represented to Mr. Lau that said investment was a direct loan of monies to Mr. Mezei and Mr. Mezei's companies.

16.     In soliciting Mr. Lau to invest with Mr. Mezei, Mr. Zoref acted in dual and conflicting capacities as agent for Mr. Mezei, NF and NHF, and as investment advisor to Mr. Lau.

17.     Mr. Lau informed Mr. Zoref that Mr. Lau was "risk adverse" and did not want to accept the offered opportunity to invest with Mr. Mezei unless the principal would not be at risk.

18.     In response, Mr. Zoref, in his conflicting capacity as agent for Mr. Mezei, NF and NHF, and as investment advisor to Mr. Lau, represented to Mr. Lau that any investment with Mr. Mezei would pose "extremely little or no risk" of loss of the invested principal because NF had sufficient collateral of $150 million dollars worth of loans and real estate holdings and because NF and NHF together had $270 million dollars in assets as collateral for Mr. Lau's loans.

19.     To further instill trust, Mr. Zoref represented to Mr. Lau that Mr. Zoref had one million dollars of his own money invested with NF.

20.     Mr. Zoref further represented that the investment opportunity provided by Mr. Mezei to Mr. Lau was reserved for "friends and family" only and that he and Mr. Mezei would not direct family and friends such as Mr. Lau into high risk investments.

21.     At the time that Mr. Zoref made these representations, Mr. Zoref and Mr. Mezei knew, but did not tell Mr. Lau, that the offered opportunity to invest with Mr. Mezei would place Mr. Lau's principal at a higher degree of risk of loss

than represented and higher than Mr. Lau desired, that NF and NHF's collateral was either non-existent or so overvalued as to be insufficient to secure Mr. Lau's invested principal and that a company named CapitalSource Finance LLC ("CapitalSource") was a senior lender to NF, thus placing Mr. Lau in the position of secondary creditor thereto.

22.    Mr. Zoref, Mr. Mezei, NF and NHF misrepresented the risk of loss and concealed that NF and NHF's collateral was insufficient and that CapitalSource existed as a senior lender to NF, in order to induce Mr. Lau to invest funds with Mr. Mezei to be loaned to Mr. Mezei's companies NF and NHF.

23.    In reliance upon Defendants' representations and omissions, Mr. Lau invested funds from his personal account with Mr. Mezei.

24.    Had Mr. Lau known that his loans to both NF and NHF were at a higher degree of risk of loss than represented and higher than Mr. Lau desired, that NF's and NHF's collateral was insufficient, and that CapitalSource existed as a senior lender to NF, thereby placing Mr. Lau in the position of secondary creditor, Mr. Lau would not have invested funds from his personal account with Mr. Mezei to provide capital to NF and NHF.

**Mr. Lau's Loan to NF**

25.    On or about April 7, 2008, Mr. Lau wired funds in the amount of $150,000.00 to NF for purchase of a promissory note with the rate of return set at 8.5% per annum.

26.    On or about April 7, 2008, NF issued to Mr. Lau a Term Promissory Note dated April 7, 2008 and signed by A. Jay Cohen as Member of NF, with a

maturity date of April 7, 2009 (the "NF Note").  A copy of the NF Note is attached hereto as Exhibit A.

27.     Under the NF Note, NF promised to pay to Mr. Lau the principal of $150,000 plus interest at the rate of 8.5% per annum, interest accrues monthly from May 1, 2008 through and including April 1, 2009, and any unpaid principal and accrued interest is due and payable by NF on April 7, 2009.

28.     Upon information and belief, Mr. Mezei and NF issued promissory notes to other persons who invested with or loaned funds to NF.

**Mr. Lau's Loans to NHF**

29.     On or about April 7, 2008, Mr. Lau mailed a cashier's check for the amount of $150,000.00 to NHF for purchase of a promissory note with the rate of return set at 9.5% per annum.

30.     On or about April 11, 2008, NHF issued to Mr. Lau a Term Promissory Note dated April 11, 2008 and signed by Patrick J. Cullinan as Vice President of NHF, with a maturity date of April 11, 2010 (the "April NHF Note").  A copy of the April NHF Note is attached hereto as Exhibit B.

31.     In or about July 2008, Mr. Lau and Mr. Zoref discussed an additional loan of $180,000 by Mr. Lau to NHF.

32.     Mr. Zoref on behalf of NHF, represented to Mr. Lau that NHF would pay interest of 13% per annum on Mr. Lau's total investment with NHF and would pay interest monthly, if Mr. Lau were to loan an additional $180,000.00 to NHF.

33.     On or about August 1, 2008, in reliance upon Mr. Zoref's representations, Mr. Lau wired $180,000.00 to NHF.

34.     Upon receipt of Mr. Lau's wire transfer of August 1, 2008, NHF held Mr. Lau's original investment of $150,000, almost $7,000 of accrued interest on that investment, and Mr. Lau's additional investment of $180,000, totaling $336,973.74.

35.     On or about September 1, 2008, NHF issued to Mr. Lau a Term Promissory Note dated September 1, 2008 and signed by Mr. Cullinan as Vice President of NHF, with a maturity date ("Expiration Date") of September 1, 2011 (the "Sept. NHF Note").  A copy of the Sept. NHF Note is attached hereto as Exhibit C.

36.     Under the Sept. NHF Note, NHF promised to pay to Mr. Lau the principal amount of $336,973.74 plus interest at the rate of 13% per annum, to pay to Mr. Lau interest on the first of every month from September 1, 2008 until the Expiration Date, and to pay to Mr. Lau any unpaid principal on the Expiration Date.

37.     Upon information and belief, Mr. Mezei and NHF issued promissory notes to other persons who invested with or loaned funds to NHF.

**Failure to Comply with Disclosure Requirements**

38.     Upon information and belief, Mr. Mezei, Mr. Zoref, NHF and NF did not register any of the Promissory Notes as securities under the federal and state securities laws and did not seek any exemption from the registration requirements of these laws.

39.     At all relevant times, Defendants knew or should have known that the Mr. Lau is not an "accredited investor," as defined by Regulation D, Rule 501(a), of the federal securities laws.

40.     Defendants failed to provide Mr. Lau with any of the disclosures required under the federal and state securities laws.

41.     Instead, Defendants misrepresented the level of risk involved and omitted and misrepresented material information.

**Northern Funding's Default on NF Note**

42.     The NF Note identifies the holder of the note as Mr. Lau.

43.     The NF Note requires NF to repay Mr. Lau the principal amount of $150,000 plus interest at the rate of eight and one-half percent (8.5%) per annum on the outstanding principal balance.

44.     The NF Note requires NF to pay to Mr. Lau the principal and accrued interest on April 7, 2009.

45.     NF did not pay to Mr. Lau the principal and accrued interest due on April 7, 2009, and, to date, has not paid the amounts due.

46.     In or about April, 2009, Mr. Mezei and Mr. Zoref told Mr. Lau that NF would not pay the principal and accrued interest due under the NF Note on April 7, 2009, but anticipated that NF would pay the principal "in two years."

47.     In or about June 2009, Mr. Mezei, on behalf of NF, issued a letter to Mr. Lau stating that the "ultimate payout will be dependent on the proceeds from the disposition of the underlying assets, which may be materially less" than the amount due under the NF Note, and that disposition of the assets underlying the

NF Note is expected to take "at least two years."  A copy of the letter is attached as Exhibit D.

48.     In or about December, 2009, Mr. Zoref contacted Mr. Lau. When Mr. Lau inquired as to whether Mr. Zoref was calling about a matter of importance, Mr. Zoref informed Mr. Lau that "it could wait" until after the holiday season.

49.     On or about January 28, 2010, Mr. Zoref told Mr. Lau for the first time that NF would not pay to Mr. Lau any of the principal or accrued interest under the NF Note.

50.     During the same conversation, on or about January 28, 2010, Mr. Zoref told Mr. Lau for the first time that CapitalSource was the "senior lender" on the NF note and, as such, would be the first creditor to be paid from the sale of any NF assets before Mr. Lau.

51.     This was the first time that Mr. Lau heard of the existence of CapitalSource and the first time Mr. Lau learned that he was in the position of secondary creditor behind CapitalSource with regard to the NF Note.

52.     On or about February 11, 2010, Mr. Mezei, along with Mr. Zoref, told Mr. Lau during a telephone conference call that NF would not pay to Mr. Lau any of the principal or accrued interest under the NF Note.

53.     During the same telephone conference call, on or about February 11, 2010, Mr. Mezei, along with Mr. Zoref, told Mr. Lau that CapitalSource was the "senior lender" on the NF note and, as such, would be the first creditor to be paid from the sale of any NF assets before Mr. Lau.

54.     Shortly thereafter, Mr. Lau began to demand, and has continued to demand, repayment of the amounts due under the NF Note.

55.     To date, none of the Defendants have paid to Mr. Lau the principal and interest due under the NF Note.

## Northern Healthcare Funding's Anticipatory Breach of Contract

56.     The Sept. NHF Note identifies the holder of the note as Mr. Lau.

57.     The Sept. NHF Note requires NHF to pay to Mr. Lau interest monthly from September 1, 2008 until September 1, 2011 at the rate of 13% per annum, and to pay the principal amount of $336,973.74 on September 1, 2011.

58.     On or about January 28, 2010, Mr. Zoref told Mr. Lau for the first time that NHF would not pay the principal due on September 1, 2011 but would instead pay out the principal "in portions" over the span of "4 to 5 years," in amounts and at times to be determined at the sole discretion of Mr. Mezei.

59.     On or about February 11, 2010, Mr. Mezei, along with Mr. Zoref, told Mr. Lau during a telephone conference call that NHF would not pay the principal due under the Sept. NHF Note on September 1, 2011.

60.     Shortly thereafter, Mr. Lau began to demand, and has continued to demand, repayment of the amounts due under the Sept. NHF Note.

61.     To date, none of the Defendants have paid to Mr. Lau the principal due under the Sept. NHF Note.

## FIRST CAUSE OF ACTION
### (Violation of Securities Laws -
### As against all Defendants)

62.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

63.     The NF Note, April NHF Note and Sept. NHF Note are securities under the federal and state securities laws.

64.     Mr. Lau is not an accredited investor under the federal and state securities laws.

65.     Defendants knew or should have known that Mr. Lau was not an accredited investor under the federal and state securities laws.

66.     Defendants issued unregistered securities to Mr. Lau without seeking an exemption under the federal or state securities laws, in violation of those laws.

67.     Defendants issued unregistered securities to Mr. Lau without making the disclosures required under the federal and state securities laws, in violation of those laws, including but not limited to Sections 5, 12(a)(1), 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77a, et seq.

68.     Defendants made misrepresentations to Mr. Lau and omitted material information in their statements to Mr. Lau, in violation federal and state securities laws, including but not limited to Sections 10(b), 20 and 20A of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t and 78t-1, and the Securities and Exchange Commission Rules promulgated thereunder.

69.     As a result, Mr. Lau is entitled to all remedies available to him under the federal and state securities laws, including but not limited to rescission of the NF and NHF Notes and return of his $486,973.74 plus consequential damages and interest, and attorney's fees and costs.

## SECOND CAUSE OF ACTION
### (Fraud – As against all Defendants)

70.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

71.     In the period January to April 2008, Mr. Zoref, as agent for Mr. Mezei, NF and NHF, falsely represented to Mr. Lau that the loans made were "of extremely little or no risk" of loss of principal, that NF had $150 million dollars worth of loans and real estate holdings to serve as collateral for the loans and that NF and NHF together had $270 million dollars in assets to serve as additional collateral for Mr. Lau's loans.

72.     In the period January to April 2008, Mr. Zoref, as agent for Mr. Mezei, NF and NHF, falsely represented to Mr. Lau that the opportunity to make said loans to NF and NHF was reserved for "friends and family" and that he and Mr. Mezei would not direct family and friends such as Mr. Lau into high risk loans.

73.     In the period January to April 2008, NF and Mr. Zoref, as agent for Mr. Mezei and NF, falsely represented to Mr. Lau that NF would pay the principal and interest due under the NF Note on April 7, 2009.

74.     In the period January to April 2008, NHF and Mr. Zoref, as agent for Mr. Mezei and NHF, falsely represented to Mr. Lau that NHF would pay the principal due on the April NHF Note on April 11, 2010.

75.     On or about September 1, 2008, NHF and Mr. Zoref, as agent for Mr. Mezei and NHF, falsely represented to Mr. Lau that NHF would pay the principal due on the Sept. NHF Note on September 1, 2011.

76.     Mr. Mezei, Mr. Zoref, NF and NHF knew that their representations to Mr. Lau were false and that they omitted material facts in their representations to Mr. Lau.

77.     Mr. Mezei, NF and NHF knew that Mr. Zoref was making false representations to Mr. Lau on their behalf and omitting material facts in representations to Mr. Lau on their behalf, and encouraged Mr. Zoref to do so in order to raise capital from Mr. Lau for Mr. Mezei, NF and NHF.

78.     Mr. Mezei, Mr. Zoref, NF and NHF made the foregoing misrepresentations to Mr. Lau and omitted material facts in their representations to Mr. Lau, in order to induce Mr. Lau to loan substantial sums of money to NF and NHF.

79.     Mr. Lau did not know that the statements by Mr. Mezei, Mr. Zoref, NF and NHF were false and they had omitted material information in their efforts to induce Mr. Lau to invest with them.

80.     Mr. Lau reasonably trusted and relied upon Mr. Mezei's and Mr. Zoref's statements and omissions by investing over $486,000.00 with Mr. Mezei, to the detriment of Mr. Lau.

81.    Mr. Lau would not have invested with Mr. Mezei and loaned over $486,000 to NF and NHF had he known his loans were a high risk investment, that there was not sufficient collateral for those loans, that he would not be repaid in full on the expiration dates of the Notes and that Capital Source existed as a senior lender to NF, thus placing Mr. Lau in the position of secondary creditor.

82.    Mr. Mezei's and Mr. Zoref's fraudulent misrepresentations and omissions were intentional, willful and malicious.

83.    As a result of the foregoing, Mr. Lau has been damaged in an amount to be determined at trial but in no event less than $486,973.74, plus consequential damages and interest, and is entitled to punitive damages in the amount of $10 million dollars.

### THIRD CAUSE OF ACTION
**(Fraudulent Inducement –
As against all Defendants)**

84.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

85.    In the period January to April 2008, Mr. Zoref, as agent for Mr. Mezei, NF and NHF, falsely represented to Mr. Lau that the loans made were "of extremely little or no risk" of loss of principal, that NF had $150 million dollars worth of loans and real estate holdings to serve as collateral for the loans and that NF and NHF together had $270 million dollars in assets to serve as additional collateral for Mr. Lau's loans.

86.    In the period January to April 2008, Mr. Zoref, as agent for Mr. Mezei, NF and NHF, falsely represented to Mr. Lau that the opportunity to make

said loans to NF and NHF was reserved for "friends and family" and that he and Mr. Mezei would not direct family and friends such as Mr. Lau into high risk loans.

87.    In the period January to April 2008, NF and Mr. Zoref, as agent for Mr. Mezei and NF, falsely represented to Mr. Lau that NF would pay the principal and interest due under the NF Note on April 7, 2009.

88.    In the period January to April 2008, NHF and Mr. Zoref, as agent for Mr. Mezei and NHF, falsely represented to Mr. Lau that NHF would pay the principal due on the April NHF Note on April 11, 2010.

89.    On or about September 1, 2008, NHF and Mr. Zoref, as agent for Mr. Mezei and NHF, falsely represented to Mr. Lau that NHF would pay the principal due on the Sept. NHF Note on September 1, 2011.

90.    Mr. Mezei, Mr. Zoref, NF and NHF knew that their representations to Mr. Lau were false and that they omitted material facts in their representations to Mr. Lau.

91.    Mr. Mezei, NF and NHF knew that Mr. Zoref was making false representations to Mr. Lau on their behalf and omitting material facts in representations to Mr. Lau on their behalf, and encouraged Mr. Zoref to do so in order to raise capital from Mr. Lau for Mr. Mezei, NF and NHF.

92.    Mr. Mezei, Mr. Zoref, NF and NHF made the foregoing misrepresentations to Mr. Lau and omitted material facts in their representations to Mr. Lau, in order to induce Mr. Lau to agree to loan substantial sums of money to NF and NHF in exchange for the Notes.

93.     Mr. Lau did not know that the statements by Mr. Mezei, Mr. Zoref, NF and NHF were false and they had omitted material information in their efforts to induce Mr. Lau to invest with them.

94.     Mr. Lau reasonably trusted and relied upon Mr. Mezei's and Mr. Zoref's statements and omissions by investing over $486,000.00 with Mr. Mezei, to the detriment of Mr. Lau.

95.     Mr. Lau would not have invested with Mr. Mezei and loaned over $486,000 to NF and NHF had he known his loans were a high risk investment, that NF and NHF did not have sufficient collateral for those loans, that he would not be repaid in full on the expiration dates of the Notes and that CapitalSource existed as a senior lender to NF, thus placing Mr. Lau in the position of secondary creditor.

96.     Mr. Mezei's and Mr. Zoref's fraudulent misrepresentations and omissions were intentional, willful and malicious.

97.     As a result of the foregoing, Mr. Lau has been damaged in an amount to be determined at trial but in no event less than $486,973.74, plus consequential damages and interest, and is entitled to punitive damages in the amount of $10 million dollars.

### FOURTH CAUSE OF ACTION
**(Negligent Misrepresentation –
As against Mr. Mezei and Mr. Zoref)**

98.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

99.   In soliciting Mr. Lau to invest funds with Mr. Mezei to be loaned to NF and NHF, Mr. Mezei and Mr. Zoref had a duty to exercise due care in providing Mr. Lau with information concerning the investment that had a reasonable basis in fact, and that was not false and misleading.

100.   Mr. Mezei and Mr. Zoref made false and misleading representations to Mr. Lau as described above that were without a reasonable basis in fact, omitted material information in their representations to Mr. Lau, and failed to exercise due care in ascertaining whether the representations were reasonably accurate and not misleading.

101.   Mr. Mezei and Mr. Zoref acted negligently, recklessly and carelessly in making false and misleading representations to Mr. Lau as described above that were without a reasonable basis in fact and in omitting material information in their representation to Mr. Lau.

102.   Mr. Mezei and Mr. Zoref knew and intended that Mr. Lau would rely on their representations and omissions in deciding whether or not to invest funds with Mr. Mezei to be loaned to NF and NHF.

103.   In reliance on Mr. Mezei's and Mr. Zoref's false and misleading representations and omissions, Mr. Lau invested funds with Mr. Mezei to be loaned to NF and NHF.

104.   Mr. Lau would not have invested funds with Mr. Mezei to be loaned to NF and NHF had he known that the funds were placed at a higher risk of being lost than was represented, that NF and NHF did not have sufficient collateral for those loans, that Mr. Lau would not be repaid in full on the expiration dates of the

Notes and that CapitalSource existed as a senior lender to NF, thus placing Mr. Lau in the position of secondary creditor.

105.   As a result of the foregoing, Mr. Lau has been damaged in an amount to be determined at trial but in no event less than $486,973.74, plus consequential damages and interest, and is entitled to punitive damages in the amount of $10 million dollars.

### FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty – As against Mr. Zoref)

106.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

107.   As Mr. Lau's investment advisor since 2006, Mr. Zoref owed a fiduciary duty to Mr. Lau.

108.   Mr. Lau reasonably relied on the misrepresentations by Mr. Zoref, his investment advisor, that investing with Mr. Mezei was a low risk and suitable investment for Mr. Lau's retirement funds.

109.   Mr. Zoref breached his fiduciary duty to Mr. Lau by knowingly making false and misleading representations to Mr. Lau and omitting material facts in his representations to Mr. Lau regarding the investments with Mr. Mezei and regarding NF and NHF.

110.   As a result of the foregoing, Mr. Lau has been damaged in an amount to be determined at trial but in no event less than $486,973.74, plus consequential damages and interest, and is entitled to punitive damages in the amount of $10 million dollars.

## SIXTH CAUSE OF ACTION
### (Professional Malpractice –
### As against Mr. Zoref)

111.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

112.    As Mr. Lau's investment advisor since 2006, Mr. Zoref was in direct privity with Mr. Lau.

113.    Mr. Lau reasonably relied on the misrepresentations by Mr. Zoref, his investment advisor, that investing with Mr. Mezei was a low risk and suitable investment for Mr. Lau's retirement funds.

114.    Mr. Zoref departed from the accepted standards of practice for investment advisors by knowingly making false and misleading representations to Mr. Lau and omitting material facts in his representations to Mr. Lau regarding the investments with Mr. Mezei and regarding NF and NHF.

115.    As a result of the foregoing, Mr. Lau has been damaged in an amount to be determined at trial but in no event less than $486,973.74, plus consequential damages and interest, and is entitled to punitive damages in the amount of $10 million dollars.

## SEVENTH CAUSE OF ACTION
### (Conversion – As against all Defendants)

116.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

117.    Defendants have failed to pay to Mr. Lau the principal and interest due and owing on the NF Note and have failed to pay to Mr. Lau the principal due and owing on the Sept. NHF Note.

118.   Defendants have converted the monies due and owing to Mr. Lau for their own use and benefit.

119.   Defendants have acted in reckless disregard of Mr. Lau's rights.

120.   As a result of the foregoing, Mr. Lau has been damaged in an amount to be determined at trial but in no event less than $486,973.74, plus consequential damages and interest, and is entitled to punitive damages in the amount of $10 million dollars.

## EIGHTH CAUSE OF ACTION
### (Breach of Contract –
### As against NF and NHF)

121.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

122.   The NF Note, April NHF Note and Sept. NHF Note are valid and binding contracts between Mr. Lau and NF and NHF, respectively, and are enforceable as against NF and NHF.

123.   Mr. Lau has fully performed under the Notes, by having loaned to NF and NHF the sums stated on the Notes.

124.   Since April 7, 2009, NF has failed to make any payment of principal or interest as required by the NF Note.

125.   Since January 28, 2010, NHF has been in breach of contract through its anticipatory repudiation of the Sept. NHF Note and has since failed to make any payment of principal due under the Note.

126.   As a result, an event of default has occurred under each of the Notes and their holder Mr. Lau has all the rights accorded to him under New York law.

127.   By virtue of the defaults by NF and NHF, Mr. Lau has been damaged in an amount to be determined at trial but in no event less than $486,973.74, plus contractual interest, statutory interest, consequential damages and costs.

**WHEREFORE**, Plaintiff respectfully demands judgment as follows:

a.   On the First Cause of Action, an award in an amount to be determined at trial but in no event less than $486,973.74 plus interest, consequential damages, attorney's fees and all statutory damages available under the securities laws;

b.   On the Second Cause of Action, an award in an amount to be determined at trial but in no event less than $486,973.74 plus interest, consequential damages and punitive damages in the amount of $10 million;

c.   On the Third Cause of Action, an award in an amount to be determined at trial but in no event less than $486,973.74 plus interest, consequential damages and punitive damages in the amount of $10 million;

d.   On the Fourth Cause of Action, an award in an amount to be determined at trial but in no event less than $486,973.74 plus interest, consequential damages and punitive damages in the amount of $10 million;

e.      On the Fifth Cause of Action, an award in an amount to be determined at trial but in no event less than $486,973.74 plus interest, consequential damages and punitive damages in the amount of $10 million;

f.      On the Sixth Cause of Action, an award in an amount to be determined at trial but in no event less than $486,973.74 plus interest, consequential damages and punitive damages in the amount of $10 million;

g.      On the Seventh Cause of Action, an award in an amount to be determined at trial but in no event less than $486,973.74 plus interest, consequential damages and punitive damages in the amount of $10 million;

h.      On the Eighth Cause of Action, an award in an amount to be determined at trial but in no event less than $486,973.74 plus interest and consequential damages;

i.      awarding Plaintiff his attorneys' fees and costs; and

j.      awarding Plaintiff such other and further relief as the Court may deem necessary, just or appropriate.


Dated: New York, New York
       June 21, 2010

HOGUET NEWMAN REGAL & KENNEY, LLP

By:    _____
       Sheryl B. Galler (SG-8182)

10 East 40th Street
New York, New York 10016
Telephone: (212) 689-8808
Facsimile: (212) 689-5101

*Attorneys for Plaintiff Steve Lau*

# Exhibit A

April 7, 2008
New York, NY

$150,000.00

## PROMISSORY NOTE

FOR VALUE RECEIVED, NORTHERN FUNDING, LLC a limited liability company organized under and existing by virtue of the laws of the State of New York, maintaining an office for the transaction of business at 132 West 31st Street, New York, NY 10001 hereby promises to pay to the order of **Steve Lau residing at 151 States Street, San Francisco, CA 94114** or at such other place as may from time to time be designated in writing by the holder of this note, the principal amount of **ONE HUNDRED FIFTY THOUSAND DOLLARS AND 00/100 ($150,000.00)** together with interest thereon at the rate of eight and one-half (8.5%) percent per annum to be computed from the date hereof on a daily bases and on the bases of three hundred and sixty (360) days per year. Such sum shall be accrued as follows: interest on the 1st day of May 2008 and every month thereafter to and including the 1st day of April 2009. The unpaid balance of principal together with accrued interest shall be due and payable on the 7th day of April 2009. Northern Funding LLC retains the option to amortize the repayment of this note over 6 months.

Under no circumstances shall the under signed be charged more than the highest rate of interest which lawfully may be charged by the holder hereof and paid by the undersigned on the indebtedness evidenced hereby. It is, therefore, agreed that if any time interest on the indebtedness evidenced hereby would otherwise exceed the highest lawful rate, only such highest lawful rate will be paid by the undersigned. Should any amount be paid by the undersigned in excess of such highest lawful amount, such excess shall be deemed to have been paid in reduction of the principal balance hereof.

Presentment for payment, notice of dishonor, protest, notice of protest, and trial by jury are hereby waived.

This note shall be governed by and interpreted in accordance with the laws of the State of New York.

Northern Funding, LLC

By: _____
A. Jay Cohen, Member

# Exhibit B

**NORTHERN HEALTHCARE FUNDING, L.L.C.**
333 Seventh Avenue – New York, New York 10001

### PROMISSORY NOTE

$150,000.00                                                            April 11, 2008

**FOR VALUE RECEIVED,** the undersigned, Northern Healthcare Funding, L.L.C ("Northern") hereby promises to pay to Steven Lau ("Payee") at 151 States Street San Francisco, CA 94114 or at such other place as the Payee shall designate from time to time the principal amount of $150,000.00 (One Hundred Fifty Thousand and 00/100 United States Dollars) plus interest at a rate of 9.5% per annum beginning the date hereof and ending April 11, 2010 ("Expiration Date"). Interest shall be accrued on the first day of each month up to the Expiration Date. The unpaid principal plus accrued interest shall be due and payable on the Expiration Date subject to the renewal provision herein. This Promissory Note will automatically renew for an additional two year period on the Expiration Date unless the Payee notifies Northern of Payee's intent not to renew this Promissory Note at least 60 days prior to the Expiration Date then in effect. Northern retains the right to prepay any or all of the outstanding principal balance and accrued and unpaid interest of this Promissory Note without penalty or premium at any time.

The rights of the Payee hereunder are expressly subordinate to the rights of Acorn Capital Group LLC ("Acorn"), as a secured lender pursuant to the Credit Agreement and the Security Agreement, each dated as of December 12, 2006, between Acorn and Northern.

The undersigned hereby waives diligence, protest, presentment, and all notices. The undersigned waives trial by jury in any litigation to enforce or with respect to this Promissory Note and the right to interpose any setoff, counter-claim or cross-claim, irrespective of the nature thereof in any such litigation.

This Promissory Note shall be governed and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed in New York.

This Promissory Note may not be modified or discharged orally, but only by an agreement in writing signed by both the undersigned and the Payee.

NORTHERN HEALTHCARE FUNDING, L.L.C.

Patrick J. Cullinan, Vice President

# Exhibit C

**NORTHERN HEALTHCARE FUNDING, L.L.C.**
333 Seventh Avenue – New York, New York 10001

### PROMISSORY NOTE

$336,973.74                                            September 1, 2008

    **FOR VALUE RECEIVED,** the undersigned, Northern Healthcare Funding, L.L.C ("Northern") hereby promises to pay to Steven Lau ("Payee") at 151 States Street San Francisco, CA 94114 or at such other place as the Payee shall designate from time to time the principal amount of $336,973.74 (Three Hundred Thirty Six Thousand Nine Hundred Seventy Three and 74/100 United States Dollars) plus interest at a rate of 13% per annum beginning the date hereof and ending September 1, 2011 ("Expiration Date"). Interest shall be paid on the first day of each month up to the Expiration Date. The unpaid principal shall be due and payable on the Expiration Date. Northern retains the right to prepay any or all of the outstanding principal balance and accrued and unpaid interest of this Promissory Note without penalty or premium at any time.

    The rights of the Payee hereunder are expressly subordinate to the rights of Acorn Capital Group LLC ("Acorn"), as a secured lender pursuant to the Credit Agreement and the Security Agreement, each dated as of December 12, 2006, between Acorn and Northern.

    The undersigned hereby waives diligence, protest, presentment, and all notices. The undersigned waives trial by jury in any litigation to enforce or with respect to this Promissory Note and the right to interpose any setoff, counter-claim or cross-claim, irrespective of the nature thereof in any such litigation.

    This Promissory Note shall be governed and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed in New York.

    This Promissory Note may not be modified or discharged orally, but only by an agreement in writing signed by both the undersigned and the Payee.

NORTHERN HEALTHCARE FUNDING, L.L.C.

Patrick J. Cullinan, Vice President

# Exhibit D



NORTHERN FUNDING, LLC

132 WEST 31st STREET ~ 14th FLOOR ~ NEW YORK, NY 10001 ~ 212-465-2003 ~ FAX: 212-465-1957

Dear Mr. Lau:

We write this letter to provide you an update on the state of our assets.

As you know, Northern Funding, LLC is a hard money lender specializing in short-term mortgages and bridge loans for real estate investment property. We finance commercial and residential investment property acquisitions, renovations, and rehabilitation projects.

During the past year we have seen some of the most dramatic events in American financial history. These events have led to one of the worst mortgage markets ever experienced. The remarkable run up and subsequent depreciation in housing prices, historically aggressive and innovative lending practices and the creation of highly levered, structured finance products have landed the U.S. mortgage market in the midst of a severely distressed cycle. Both whole loans and mortgage securities are trading at, in our view, historically low, distressed levels. As the mortgage markets continue to take a beating, home prices continue to fall and defaults/delinquencies continue to rise.

Unfortunately, we are not immune to the current conditions and the value of our assets has been affected. As the financial, and more specifically the real estate markets have been hit, many of our mortgages have suffered valuation declines. We believe that in most cases our original analysis of these mortgages remains correct, but due to significant changes in market valuation, unless the markets stabilize and return to some reasonable percentage of prior values, we may not be able to achieve a full recovery. Consequently, your ultimate payout will be dependent on the proceeds from the disposition of the underlying assets, which may be materially less than the amount shown on the enclosed statement.

Over the past few months, we have been meeting with our senior lenders and advisors in hopes of devising the best possible plan to maximize the value of the portfolio. We have determined that in most cases, the optimal course of action is to either foreclose or obtain a long-term forbearance agreement from our borrowers and begin to rent properties as opposed to selling them at a discount into the distressed marketplace. In cases where additional construction is required our banks have tentatively agreed to fund the necessary renovation money. Completing the projects will also position us to be able to sell a better product when the market turns around. Although it is extremely difficult to anticipate when the markets will stabilize, we anticipate this process will take at least 2 years.

We will continue to provide you with regular statements with our goal to be as transparent as possible. We encourage any note holder to call and ask questions about all of our mortgage and real estate holdings. If you have any questions, please feel free to call us anytime at 212-465-2003.

Leonard Mezei